BENJAMIN B. WAGNER
United States Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700
Facsimile:  (916) 554-2900

MOLLY J. MORAN
Acting Assistant Attorney General
CHIRAAG BAINS
Trial Attorney
Civil Rights Division
U.S. Department of Justice
601 D Street, NW
Washington, DC 20530
Telephone: (202) 353-1994
Facsimile:  (202) 514-0293

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>    v.<br><br>ANTHONY MERRELL TYLER,<br><br>              Defendant. | CASE NO.  2:13-CR-011 JAM<br><br>GOVERNMENT'S SENTENCING MEMORANDUM<br><br>DATE: November 14, 2014<br>TIME: 9:30 a.m.<br>COURT: Hon. John A. Mendez |

### I.     INTRODUCTION

The Government respectfully submits this memorandum to inform the Court of the Government's sentencing recommendation as to defendant Anthony Merrell Tyler and the basis for that recommendation. The defendant is scheduled to be sentenced on October 14, 2014.

Defendant Tyler was charged in a three-count indictment on January 16, 2013, for his role in a racially motivated assault against a white man and African American woman that occurred on April 18, 2011, in Marysville, California. On March 11, 2014, he pleaded guilty to Count 2, a violation of the Shepard-Byrd Hate Crimes Prevention Act, 18 U.S.C. § 249. Co-defendant Billy James Hammett

pleaded guilty to Count 2 on December 17, 2013, and was sentenced in this Court on March 25, 2014, to 87 months in prison. Co-defendant Perry Sylvester Jackson also pleaded guilty on December 17, 2013, to Count 2 and was sentenced on April 29, 2014, to 70 months in prison.

Defendant Tyler and the Government entered into a plea agreement which differs from those of his co-defendants, who entered Rule 11(c)(1)(C) plea agreements—Hammett to a sentencing range and Jackson to a particular sentence. Tyler's plea agreement specified that the Court was not a party to the agreement and would not be bound by any recommendations contained therein: "The Court is under no obligation to accept any recommendations made by the government, and the Court may in its discretion impose any sentence it deems appropriate up to an including the statutory maximum stated in this plea agreement." C.R. 52 at 2 (Plea Agreement, filed 3/11/14). (The Court sentenced Hammett to the high end of the applicable sentencing range and sentenced Jackson, after providing notice, above the sentence agreed upon by the parties.)

In the plea agreement, the parties agreed to certain guidelines calculations but did not agree about the application of the dangerous-weapon guideline under U.S.S.G. § 2A2.2(b)(2)(B) and the minor-participant mitigation guideline under § 3B1.2(b). The Government further agreed to recommend the low end of the applicable guideline range. The Presentence Report ("PSR") calculates the total offense level as 21, consistent with the Government's analysis, and Tyler's criminal history category as III, for a sentencing guidelines range of 46 to 57 months. The Probation Office recommends a high-end sentence of 57 months. For reasons explained herein and consistent with its obligations under the plea agreement, the Government recommends a sentence of 46 months. The Government also recommends a supervised release term of three years and a fine of $7,500.

## II.     SENTENCING PROVISIONS IN THE PLEA AGREEMENT

The Government and defendant Tyler have entered certain stipulations as to sentencing in the Plea Agreement. In Part VI.B of the Plea Agreement, the parties stipulated that the base offense level is 14 under U.S.S.G. § 2A2.2(a). The parties further agreed to the addition of three levels under § 2A2.2(b)(3)(A) because victim R.C. sustained bodily injury; and three levels under § 3A1.1(a) because the defendant intentionally selected the victim because of the actual or perceived race and color of any person. In Parts VI.B.6 and VI.B.7, the parties noted that they did not agree as to the addition of four

levels under § 2A2.2(b)(2)(B) because a dangerous weapon—here, a crowbar—was used, or to the reduction of two levels under § 3B1.2(b) based on Tyler's status as a "minor participant."  In Part III.B of the plea agreement, the Government did agree to recommend a three-level reduction for acceptance of responsibility and an ultimate sentence at the low end of the guidelines range determined by the court.

Among other waivers, in Part VII.B. the defendant agreed to give up his right to appeal his sentence "as long as the sentence does not exceed the top of the guideline range calculated by the Probation Officer."

### III.     THE PRESENTENCE REPORT

In the PSR, the U.S. Probation Officer reviews the facts of the offense and calculates the applicable guidelines range.  Beginning with a base offense level of 14, the PSR includes a four-level increase for use of a dangerous weapon (a crowbar), and an additional three-level increase for injury to the victims.  PSR ¶¶ 22-24.  It also includes a three level upward adjustment for hate crime motivation.  PSR ¶ 27.  The PSR credits the defendant with a three-level reduction for acceptance of responsibility, for a total offense level of 21.  PSR ¶¶ 20, 33-34.  The PSR also reviews the defendant's prior criminal conduct and concludes that his criminal history category is III.  PSR ¶¶ 36-44.  Accordingly, the PSR determines that defendant Tyler's guideline imprisonment range is 46 to 57 months.  PSR ¶ 63.  The PSR also determines based on Tyler's employment history and assets that he is able to pay a fine.  PSR ¶ 61.

Ultimately, the PSR recommends a prison sentence of 57 months, at the high end of the applicable range, as well as three years of supervised release and a fine of $7,500.  PSR ¶¶ 83-85.

The PSR also notes that victim R.C. is due $175 for the cost of replacing his car's windshield, which defendant Tyler shattered during the attack.  PSR ¶¶ 8, 10, 72.  The Probation Officer also recommends, therefore, restitution in the amount of $175, in addition to a $100 assessment.  PSR ¶¶ 72, 85.

The Government has no objection to any statements of material fact or policy statements contained in, or omitted from, the PSR.  The Government agrees that the defendant is entitled to a three-level reduction for acceptance of responsibility.  As defendant Tyler timely notified the Government of his intention to plead guilty, permitting the Government and the Court to conserve resources, the

Government now moves under § 3E1.1(b) for the full three-level reduction.

### IV.     DISPUTED SENTENCING GUIDELINES

The Government concurs with the Probation Officer that the dangerous-weapon sentencing enhancement applies, and that the minor-participant reduction does not apply, to defendant Tyler.

#### A.     Dangerous-Weapon Guideline

In calculating a defendant's offense level, the federal sentencing guidelines instruct that "[i]f . . . a dangerous weapon . . . was otherwise used, increase by 4 levels." § 2A2.2(b)(2)(B). The application of this guideline depends on two elements: (1) whether the object in question is a "dangerous weapon," and (2) whether it was "otherwise used" in the offense.

The guidelines definition of "dangerous weapon" includes "an instrument capable of inflicting death or serious bodily injury." § 1B1.1 cmt. 1(D). In United States v. Goodbear, 676 F.3d 904, 909-10 (9th Cir. 2012), the Ninth Circuit held that a belt used to beat the victim justified a four level increase for use of a dangerous weapon. In United States v. Lavender, 224 F.3d 939 (9th Cir. 2000), the Court held that a screwdriver possessed during a bank robbery "was properly categorized" as a dangerous weapon because it "can be used to stab someone in the throat or chest, or to gouge out someone's eye, causing serious bodily injury." Id. at 941; see also United States v. Smith, 905 F.2d 1296, 1300 (9th Cir. 1990) (noting that an inoperable gun can be a dangerous weapon because it can "cause harm when used as a bludgeon"), superseded by statute on other grounds. The Court of Appeals has held that an object can also be classified as a dangerous weapon based on its "ability to incite fear and violence because it appears to be dangerous." United States v. Michael, 220 F.3d 1075, 1076 (9th Cir. 2000) (cell phone, represented as a gun, constituted dangerous weapon); see also United States v. Boyd, 924 F.2d 945, 947-48 (9th Cir. 1991) (road flare represented to be stick of dynamite during bank robbery); Smith, 905 F.2d at 1300 (inoperable pellet gun). In the instant case, Tyler's crowbar is unquestionably a dangerous weapon. It can be used to cause serious bodily injury, and its presence in the context of an assault has the ability to incite fear and violence. See United States v. Woodrup, 935 F.2d 1288, at *1-2 (4th Cir. June 14, 1991) (unpublished)(upholding dangerous-weapon enhancement for defendant who held crowbar and hammer and refused to drop them when ordered to do so by responding police officers).

The guidelines define "otherwise used" as conduct that "did not amount to the discharge of a

firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon." § 1B1.1 cmt. 1(I). The Ninth Circuit has further held that the guideline should be applied "only when a defendant used an instrument capable of causing serious bodily injury with the intent to injure his victim." United States v. Dayea, 32 F.3d 1377, 1380 (9th Cir. 1994) (holding that dangerous-weapon enhancement was not applicable to drunk driver who killed one person and injured another because he did not make "intentional use of his truck" and thus "was not using his truck as a weapon"). Here, defendant Tyler struck the victims' car windshield twice with crowbar, causing glass to shatter into the front passenger compartment. He kept possession of the crowbar throughout the assault, brandishing it when victim R.C. ran from him and his co-defendants and even swinging it toward R.C. as the three co-defendants attacked R.C. in the gas station's parking lot. See screenshots from video, infra page 7. Fortunately, Tyler did not succeed in striking R.C. with the crowbar. His intent to cause bodily injury, however, is evident from the totality of his conduct. On these facts, there is no serious argument that Tyler was not "using" the crowbar "as a *weapon*" during the attack. Dayea, 32 F.3d at 1380.

Finally, the Government notes that this Court applied the dangerous-weapon enhancement to both Hammett and Jackson as relevant conduct based on *Tyler*'s use of the crowbar.

### B. Minor-Participant Guideline

Under U.S.S.G. § 3B1.2(b), the Court is to decrease a defendant's offense level by two levels "[i]f the defendant was a minor participant in any criminal activity." A defendant seeking to avail himself of this guideline bears the burden of proving its application by a preponderance of the evidence. United States v. Howard, 894 F.2d 1085, 1090 (9th Cir. 1990). Importantly, the Ninth Circuit has instructed that "[d]ownward adjustments for minor participant status are to be used 'infrequently.'" United States v. Pinkney, 15 F.3d 825, 828 (9th Cir. 1994) (quoting United States v. Andrus, 925 F.2d 335, 337 (9th Cir. 1991)).

Defendant Tyler cannot carry his burden. The Ninth Circuit has emphasized the need to look at overt actions of the participants. Howard, 894 F.2d at 1088 (rejecting defendant's emphasis on comparing mental states alone). Video footage of the attack makes clear that the three defendants acted in concert toward the same goal. Hammett first distracted victim S.L. at the driver's side of the car. Jackson then ran up from the passenger side, punching victim R.C. twice through the window. As R.C.

tried to defend himself against Jackson, Tyler immediately entered the fray, smashing his crowbar against the windshield twice and shattering it while the two victims sat just behind it. Crowbar in hand, Tyler then pursued R.C. along with his co-defendants, and all three assaulted R.C. as he scrambled to get away. Tyler brandished and swung his crowbar toward R.C. All three chased after R.C. out of the view of the security camera. <u>See</u> <u>infra</u> page 7.

Even if Tyler could somehow show that that he is less culpable than Hammett and/or Jackson, he certainly cannot show he is "*substantially* less culpable," as required by the guidelines. § 3B1.2 cmt. 3(A) (emphasis added); <u>United States v. Araujo-Velarde</u>, 2014 WL 2119296, *1 (9th Cir. 2014); <u>see also</u> <u>United States v. Benitez</u>, 34 F.3d 1489, 1498 (9th Cir. 1994). In fact, the evidence establishes that in some ways, Tyler is *more* culpable than his co-defendants: He is the only one who actually possessed and used a weapon during the attack.

Accordingly, this Court should find that Tyler was not a minor participant in the attack and deny any request to reduce the offense level under § 3B1.2(b), consistent with the PSR.

### V.    § 3553(A) FACTORS

In sentencing the defendant, the Court must consider the factors listed in 18 U.S.C. § 3553(a), which are discussed in the PSR at ¶¶ 78-84. Among the important factors are the nature and circumstances of the offense, the history and characteristics of the defendant, and, relatedly, the impact of the crime on the victims. The Government provides the following information to assist the Court.

#### A.    Salient Facts of the Offense of Conviction

The assault on the victims was described in detail in the Government's sentencing memorandum for co-defendant Hammett, C.R. 53, and the Government is aware that the Court has viewed the parking lot surveillance camera videotape of the incident. Accordingly, the Government will not repeat the full description of the offense here. As indicated previously, however, it is clear that defendant Tyler and his co-defendants' assault on the victims—a white man and an African American woman—was unprovoked and based on race.

What is worth noting with respect to this defendant, as noted above, is his concerted action with his co-defendants and his use of the crowbar. The following screenshots depict Tyler smashing the car windshield twice, wielding the crowbar as he chased after R.C., and swinging the weapon toward R.C.

PSR ¶¶ 8-9.


*Tyler delivering first crowbar blow to windshield*


*Tyler delivering second crowbar blow to windshield*


*Tyler pursuing R.C. with crowbar in hand*


*Tyler swinging crowbar at R.C.*

R.C. sustained injuries, including abrasions to both knees and his right forearm, and paid $175 to replace his windshield.  PSR ¶ 11.  S.L. later said she sustained bruising to her chest, and stated that she is still afraid when people approach her in her car. PSR ¶ 18.

### B.     History and Characteristics of the Defendant

Defendant Tyler unquestionably engaged in violent behavior in the course of this racially-motivated crime.  His racially motivated violence is consistent with an attachment to a white supremacist ideology.  Tyler has the word "white" tattooed down the back of his left upper arm, "pride" down the back of his right upper arm, and a swastika on his right upper arm.  PSR ¶ 13.  He was listed in the local gang database as being a Peckerwood gang member.  White supremacist ideology is a core belief of Peckerwood gang members.  Yuba County Sheriff's Department booking sheet notes from a 2007 arrest state that Tyler described himself as being a Yuba County Peckerwood from the age of 13.  Tyler also stated in 2008 that he associates with Peckerwoods.  In 2010, Tyler told jail staff that he no longer associates with Peckerwoods but could not be housed with "blacks or Northerners."  PSR ¶ 13.

As noted in the PSR, Tyler's criminal history includes a felony conviction for carrying a concealed, loaded weapon, and two misdemeanor convictions for driving with a suspended license, and one misdemeanor conviction for driving under the influence. PSR ¶¶ 38-41. The PSR also notes that between 1995 and 2010, Tyler was arrested but not convicted for offenses including violation of civil rights by force or threat; possessing, manufacturing or selling a dangerous weapon; carrying a loaded firearm in a public place; violating probation; driving without a license; and inflicting corporal injury on a spouse or cohabitant. PSR ¶ 47.

### C. Impact of the Offense on the Victims

The impact on the victims is an important consideration under § 3553(a), particularly under subsection (1) or (2). See United States v. Christensen, 732 F.3d 1094, 1104 (9th Cir. 2013) (approving the district court's consideration of victim statements about the "life-destroying impacts" of the defendant's crime because the information reflected on the "intangible nature of [the defendant's] conduct" and because it was relevant to evaluating the seriousness of the offense, the need to provide deterrence, and the need to protect the public from the defendant).

As noted in the Government's prior sentencing memorandum, in addition to the physical injuries inflicted, the attack and its aftermath had a psychological impact on S.L. and R.C. Victim S.L. told investigators that after the incident she felt traumatized and slept with a jack or knife nearby. As noted in the presentence report, S.L. continues to feel fear, particularly when she is approached in a car. PSR ¶ 18.

Both victims also reported being subjected to intimidation and obstruction of justice after giving statements to the police. S.L. expressed fear of testifying as a result of being threatened and offered money not to cooperate with the investigation. She stated that R.C. was also afraid. R.C. confirmed that he had been told to tell a defense investigator that he heard someone say "get the gun" from inside his car during the incident. PSR ¶ 15. (Three days after the attack, Tyler told investigators that he smashed the victims' car windshield in defense of Hammett and Jackson because he heard someone in the car say "get the gun." PSR ¶ 12.) R.C. was also instructed to tell the investigator that he knew Tyler from before the incident, and had sold a car to one of the defendants. PSR ¶ 15. R.C. in fact made these statements to a defense investigator, although he mistakenly identified Tyler as "Anthony Perry."

Ultimately, the investigation did not produce sufficient evidence to determine who was responsible for the obstruction of justice.

## VI. GOVERNMENT'S RECOMMENDATION

The Government recommends that the Court sentence defendant Tyler to 46 months in prison, the low end of the applicable guideline range, consistent with the Government's agreement in the Plea Agreement.

It is important to note that the total offense level of 21 in this case involves an increase of four levels for use of a dangerous weapon (§ 2A2.2(b)(2)(B)); three more levels for injury to the victims, although physical injury was not severe in this case (§2A2.2(b)(3)(A)); and three more levels for hate-motivated crime (§3A1.1(a)). Each of those adjustments is fully warranted in this case, but the Government notes that the final adjusted offense level in the PSR reflects a full accounting under the guidelines for the defendant's conduct in this matter. A sentence at the low end of the corresponding guideline range is appropriate as to this defendant. A sentence of 46 months represents a significantly longer sentence than Tyler has ever faced before. It reflects the seriousness of the offense and communicates to the defendant and to others that civilized society has no place for racially motivated violence.

In addition, in the Government's view, a sentence for Tyler that is lower than that imposed on defendants Hammett and Jackson is appropriate. According to the Probation Officer, Tyler has a criminal history category of III, while defendants Hammett and Jackson each had a criminal history category of V. Finally, while Tyler's role in the assault in this case was by no means minor, it appears from the video that defendants Hammett and Jackson initiated contact with the victims before defendant Tyler.

Thus, the Government recommends a sentence of 46 months incarceration, to be followed by three years of supervised release with the conditions recommended by the Probation Officer. The Government joins the Probation Officer in recommending restitution of $175 to cover R.C.'s windshield replacement and a mandatory special assessment of $100.

The Government also joins the Probation Officer's recommendation that the Court impose a fine of $7,500. Unlike the other two defendants, as to whom the Probation Officer recommended no fine,

defendant Tyler has had a steady employment history, is currently employed, and has the skills to be employed after release from any prison term.  PSR ¶ 61.  He also has several assets, including a recently purchased off-road vehicle, and his girlfriend's salary helps cover their household expenses.  PSR ¶ 61.  Accordingly, the Probation Officer finds that Tyler is able to pay a fine and recommends a fine of $7,500.

The defendant agreed in Part II.C of the plea agreement to pay a fine if one were imposed.  The recommended fine is at the low end of the guidelines range, which is $7,500 to $75,000.  A fine of $7,500 would further the goals of § 3553(a) and send a continuing message about the seriousness of the defendant's criminal conduct in this case.

Dated:  September 30, 2014                    Respectfully submitted,

/s/ Benjamin Wagner
BENJAMIN B. WAGNER
United States Attorney

/s/ Chiraag Bains
CHIRAAG BAINS
Trial Attorney
Civil Rights Division